**UNITED STATES of America,**
**Plaintiff,**

v.

**Eduardo MASFERRER and John Jacobs, Defendants.**

**No. 04–20404–CR–KING.**

United States District Court,
S.D. Florida.

April 29, 2005.

Richard Hong, Esq., Ben Greenberg, Esq., Assistant United States Attorneys, Miami, FL, for Government.

Howard Srebnick, Esq., Black Srebnick & Kornspan, P.A., Scott Srebnick, Esq., Daniel Small, Esq., Duane Morris, LLP, Miami, FL, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO EXCLUDE EXPERT WITNESSES

JAMES LAWRENCE KING, District Judge.

THIS CAUSE is before the Court upon Defendants' Motion to Exclude Expert Testimony, filed January 5, 2005.

## I. *FACTUAL BACKGROUND*

On June 22, 2004, the Government issued a forty-two Count Indictment against Defendants Eduardo Masferrer, John Jacobs and Juan Carlos Bernace.[1] The charges against Defendants are predicated on a number of financial transactions conducted by Hamilton Bank ("Hamilton Bank") in 1998–99.

Hamilton Bancorp, Inc. ("Hamilton Bancorp") was a publicly-held bank holding company that conducted its operations through its wholly-owned subsidiary, Hamilton Bank. In March 1997, Hamilton Bancorp conducted an initial public offering of its common stock. Defendant Masferrer was the Chairman of the Board of Directors, President and Chief Executive Officer of Hamilton Bancorp and Hamilton Bank owning approximately 800,000 shares of its stock. Defendant Jacobs was the Senior Vice–President, Chief Financial Officer of Hamilton Bancorp, and Senior Vice–President of Hamilton Bank owning approximately 10,000 shares of Hamilton Bancorp stock. The indictment alleges that, as officers of the corporation, the compensation each received was linked to the corporate performance and market price of the common stock of Hamilton Bankcorp. As a further part of its compensation to executives and employees, Hamilton Bancorp distributed as bonuses a percentage of its pre-tax net income, after deducting loan losses.

After becoming a publicly held company in March 1997, Hamilton Bancorp reported a very rapid growth of assets to the public, with the market price of Hamilton Bancorp's common stock increasing from $15.50 to $32.00 per share by March 1998. With the rapid growth, Hamilton Bank increased its loan portfolio by purchasing approximately $20 million worth of loans made to banks and municipal governments by the Russian government between the dates of May 1997 and June 1998.

The indictment alleges that in September 1998, Hamilton Bank sold a City of Moscow $6,000,000 note, purportedly at its face or original value, to West Merchant Bank. It is alleged that this was in exchange for Hamilton Bank's purchase, through another entity, Morgan Grenfell &

---

1. Defendant Juan Carlos Bernace pled guilty on February 9, 2005.

Company, Ltd., ("Morgan Grenfell"), of (a) Hong Kong and Shanghai Banking Corporation and (b) Standard Chartered subordinated notes for $15,000,000, face value, form West Merchant Bank. The indictment also alleges that in September 1998, Hamilton Bank sold back the City of Moscow loan[2] for $5,000,000 (its face or original value) to West Merchant Bank. This was (it is alleged) in exchange for Hamilton Bank's purchase, through Morgan Grenfell, of four Latin American securities purportedly at par, for $19,049,000 face value, from West Merchant Bank.

In September 1998, Hamilton Bank sold back the Vneshtorbank loan for $1,500,000 of its face value, to West Merchant Bank in exchange for Hamilton Bank's purchase, through Morgan Grenfell, of two Latin American securities for $5,500,000 face value, from West Merchant bank. That same month, Hamilton Bank sold back the Mezhcombank loan for $7,500,000 face value, to Standard bank in exchange for Hamilton Bank's purchase of eleven Latin American securities, including trade notes of a Mexican iron company, Altos Homos de Mexico, S.A. De C.V. ("AHMSA"), purportedly at par, for a total of $54,410,000 face value, from Standard Bank.

The Government further alleges a year later, in September 1999, Hamilton Bank sold the AHMSA trade notes purportedly at par, for $5,000,000 (face value) to West LB (formerly known as West Merchant Bank) in exchange for Hamilton Bank's purchase from West LB of six Latin American securities purportedly at par, for $30,250,000 (their face value).

The Government contends that all of the foregoing described sale and purchase of loans, notes and evidences of indebtedness were done with the knowledge, approval and at the instigation of the Defendants Eduardo Masferrer, John Jacobs and other executives of the bank.

As a publicly-held company, Hamilton Bancorp was regulated by the United States Securities and Exchange Commission ("SEC"). Federal law requires publicly-held companies such as Hamilton Bancorp to submit various reports containing detailed financial data to the SEC. It is further required that the accounting treatments used in these reports to be in accordance with generally accepted accounting principles. Federal law also requires that publicly-held companies undergo an annual audit to insure that its financial data was prepared and reported in accordance with these accounting principles.

As a national bank, Hamilton Bank was also regulated by the Office of the Comptroller of the Currency ("OCC") of the United States Department of the Treasury charged with the responsibility for preserving the integrity of the banking system. Federal law requires that all national banks to submit to periodic examinations by the OCC, to insure that the bank's lending practices were in accordance with OCC's regulations.

During the annual bank examination of Hamilton Bank in September 1999, OCC bank examiners discovered what they believed were links between Hamilton Bank's 1998 sale of the Russian loans and Hamilton Bank's purchase of Latin American and other non-Russian securities during the same time period. Hamilton Bank sold its Russian loans at par (face or origi-

---

**2.** Gazprombank is the official name of the Russian government-owned bank that issued

the original $6,000,000 face value note.

nal value) and bought Latin American and non-Russian securities in the secondary market in the fall of 1998. In September 1999, Hamilton Bank had sold its AHMSA trade notes at par (face or original value) and paid par for other Latin American securities in the secondary market. The OCC examiners reviewed these transactions to determine they were properly recorded at fair market value, as required by the Financial Accounting Standards Board ("FASB") in Hamilton Bank's books and records. The OCC questioned whether Hamilton Bank's September 1998 transactions involving the sale of the Russian loans to West Merchant Bank and Standard Bank, in exchange for the purchase by Hamilton Bank from West Merchant Bank and Standard Bank of various Latin American and non-Russian securities, were related transactions.

The indictment states that in December 2000, as a result of OCC's examination, Hamilton Bancorp acknowledged that the 1998 Russian loan transactions were not properly accounted for in the company's books. Hamilton Bancorp restated its earnings results and filed with the SEC amended quarterly reports on Form 10–Q for periods ended in March 31,1999 and June 30, 1999. Hamilton Bancorp also filed with the SEC an amended annual report on Form 10–K for the year ended December 31, 1998. The restatement of its earnings results for the fiscal year of 1998 showed that Hamilton Bancorp had a pre-tax loss of more than $22 million resulting from its sale of the Russian loans in September 1998.

During the summer of 1998, the Russian economy had declined dramatically, the Russian banking system was in danger of collapsing, and thus Russian assets, including loans to Russian banks and entities, were trading for substantially below their face or original value (par value). In the late summer of 1998, the Government alleges that members of the Board of Directors of Hamilton Bancorp discussed their concerns about the potential negative impact of having Russian loans on Hamilton Bank's books, and instructed the Hamilton Bank managers to seek the sale of the Russian loans.

The Government claims that the market value of all the assets in question was less than their face value at the time, but that Hamilton Bank "swapped" its Russian loans with the Latin American assets at face value in an artificially "adjusted price trade/or ratio swap"[3] with Standard Bank and Westdeutsche, in order to avoid reporting a loss on its Russian loans in its quarterly and annual financial reports filed with the SEC. The Government's theory is that the Defendants knew (1) the transactions were related for accounting purposes and should have been reported as such; (2) that the Defendants knew that the performing Russian loans and Latin American assets were worth less than their face value; and (3) that the Defendants knowingly failed to comply with accepted accounting principals on Hamilton Bank's financial reports by reporting the purchased Latin American assets at their face value.

As a result the aforementioned events, the Government alleges that the Defen-

---

**3.** The Government states in their indictment that a ratio swap occurs when one party ("Party A") sold an asset (or a set of assets such as loans or securities) at an inflated value to a counter party ("Party B") and, as part of the same transaction, Party B sold to Party A another asset (or another set of assets) at an inflated value. As such, the purpose of the swap, from Party A's perspective, was to sell particular assets while concealing the current discount or losses of the assets sold.

dants conspired to conceal the losses from the sale of the Russian loans in 1998 and the AHMSA trade notes in 1999 and, thereby, fraudulently inflated Hamilton Bancorp's reported results of operations and financial condition so that Defendants; (a) would unjustly enrich and benefit themselves through higher salaries, bonuses, stock options and by the capital appreciation of their Hamilton Bancorp shares; and (b) would facilitate Hamilton Bank's trust preferred securities offering.

On January 11, 2002, determining that Hamilton Bank had allegedly operated in an unsafe and unsound manner, the OCC closed Hamilton Bank and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver.

The Government has the burden to prove that Defendants did knowingly, willfully and unlawfully combine, conspire, confederate and agree with each other to commit certain offenses against the United States, namely: to knowingly and willfully devise and intend to devise a scheme and artifice to defraud, and to obtain money and property from others by means of materially false and fraudulent pretenses, representations and promises knowing that they were false and fraudulent when made, and transmitting and causing to be transmitted certain wire communications in interstate and foreign commerce for the purpose of executing the scheme, which affected a financial institution.

## II. PROCEDURAL BACKGROUND

The Government intends to call three witnesses Ross Buckley ("Buckley"), Timothy Seymour ("Seymour"), and Morris Hollander ("Hollander") for the purpose of giving opinion testimony on the validity of the financial transactions engaged in by Hamilton Bank described above, and the reporting of those transactions by Defendants.[4] On January 5, 2005, Defendants filed a Motion in Limine to Exclude Expert Testimony, or in the Alternative for a *Daubert* Hearing. Within their motion, Defendants contended that "the proffered testimony of the Government's expert witnesses raises serious concerns about the reliability of that testimony, whether it will assist the trier of fact, and whether it will invade the province of the Court to instruct the jury."[5]

In order to be in a better position to evaluate the anticipated expert evidence and to determine whether or not it complies with the requirements of law, the Court ordered a *Daubert* evidentiary hearing for February 9, 2005. The hearing was held as scheduled and the three witnesses testified regarding their opinions and the basis therefore. Counsel for the Defendants were accorded opportunity to cross-examine and argue their respective objections.[6]

## III. LEGAL STANDARD

When a party offers expert testimony

---

**4.** On November 17, 2004, the Court ordered the Government to submit a brief, outlining the issues that will be covered by their expert witnesses and informed the parties that a *Daubert* Hearing may be held.

On December 17, 2004, the Government filed its Response to the Court's Inquiry Regarding the Government's Experts.

**5.** The Government's response was filed on January 21, 2005.

**6.** Post-evidentiary memorandums of law were subsequently filed on February 16th, 18th and 28th, 2005.

and the opposing party raises a *Daubert*[7] challenge, the trial court must make certain that a witness tendered as an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Federal Rule of Evidence 702 lays out the circumstances in which expert testimony is admissible:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

*Daubert* requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury. *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. As a gatekeeper the court must do "a preliminary assessment of whether the reasoning or methodology properly can be applied to the facts in issue." *Id.* at 593–94, 113 S.Ct. 2786. The proposed testimony must derive from the scientific method; good grounds and appropriate validation must support it. *Id.* at 590, 113 S.Ct. 2786.

> A trial court, in determining the admissibility of expert testimony under Rule

702, must conduct "a rigorous three-part inquiry," considering whether (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions in sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.2004) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998)).

The "gatekeeping" function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir.2002). The district court's role is especially significant since the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it. *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay if the facts or data are of the type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. *Frazier*, 387 F.3d at 1260.

The proponent of the expert testimony carries a substantial burden under

---

**7.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Rule 702. "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir.1999) (citing *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786). Thus, the proponent must demonstrate that the witness is qualified to testify competently, that his opinions are based on sound methodology, and that his testimony will be helpful to the trier of fact. *See, e.g., Frazier,* 387 F.3d at 1260 ("The Burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit, or the government of the accused in a criminal case"); *McCorvey,* 298 F.3d at 1257; *Maiz,* 253 F.3d at 644.

In determining the admissibility of the proposed expert testimony under Rule 702, the trial court must consider the following three-part inquiry:

**A. *The witness must be found qualified before permitted to give opinion testimony.***

■ While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status. *Frazier,* 387 F.3d at 1260–61.[8] The observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express. *Frazier,* 387 F.3d at 1261.

While an expert's overwhelming qualifications may bear on reliability of his proffered testimony, they are by no means a guarantor of reliability ... [O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony. *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1341–42 (11th Cir.2003). "Quite simply, under Rule 702, the reliability criterion remains a discrete, independent, and important requirement for admissibility." *Frazier,* 387 F.3d at 1261.

The trial court's gatekeeping function requires more than simply taking the expert's word for it. Fed.R.Evid. 702 advisory committee's note (2000 amends.) (emphasis added); *see also Daubert v. Merrell Dow Pharmaceuticals. Inc.,* (on remand), 43 F.3d 1311, 1316 (9th Cir.1995) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that the expert's bald assurance of validity is not enough). Thus, it remains a basic foundation for admissibility that "[p]roposed [expert] testimony must be supported by appropriate validation *i.e.* good grounds, based on what is known." *Frazier,* 387 F.3d at 1261 (citing *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786). The Rules of Evidence, especially Rule 702 ... assign to the trial judge the task of ensuring that an expert's testimony ... rests on a reliable foundation. *Id.* at 597, 113 S.Ct. 2786.

**B. *The methodology by which the witness reaches his opinion must be reliable.***

■ When evaluating the reliability of scientific expert opinion, the trial judge

---

**8.** In fact, the plain language of Rule 702 makes this clear: expert status may be based on knowledge, skill, experience, training, or education. *Id.* The Committee Note to the 2000 Amendments of Rule 702 also explains

that "[n]othing in this amendment is intended to suggest that experience alone may not provide a sufficient foundation for expert testimony." Fed.R.Evid. 702 advisory committee's note (2000 amends.)

must assess whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue. *Frazier*, 387 F.3d at 1261 (citing *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786.) To evaluate the reliability of scientific expert opinion, the court considers, to the extent possible:

(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Quiet Tech.*, 326 F.3d at 1341 (citing *McCorvey*, 298 F.3d at 1256 (citing *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786)).

▮ The same criteria that are used to access the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony. *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. In determining whether an expert's testimony is reliable, the *Daubert* factors are applicable in cases where an expert eschews reliance on any rigorous methodology and instead purports to base his opinion merely on experience or training. *Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir.1999). Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful. *Frazier*, 387 F.3d at 1262. As a result, the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement

that the trial judge evaluate the reliability of the testimony before allowing its admission at trial. *Frazier*, 387 F.3d at 1262. See Fed.R.Evid. 702 advisory committee's note (2000 amends.) "The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well reasoned, and not speculative before it can be admitted." (emphasis added).

## C. The witnesses' testimony must assist the jury.

Expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. *Frazier*, 387 F.3d at 1262. *See United States v. Rouco*, 765 F.2d 983, 995 (11th Cir.1985) (expert testimony is admissible if it offers something beyond the understanding an experience of the average citizen). Proffered expert testimony generally will not help the trier of fact when it offers nothing more than factual and legal conclusions argued by experienced lawyers for the parties in closing arguments. *Frazier*, 387 F.3d at 1263–63 (quoting 4 Weinstein's Federal Evidence § 702.03).

To be admissible, expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue ...." Fed.R.Evid. 702. "This condition goes primarily to relevance." *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786. As the Supreme Court has recognized, this "consideration has been aptly described by Judge Becker as one of 'fit.'" *Id.* at 591, 113 S.Ct. 2786, citing *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985). Therefore, the Court must determine whether the proposed testimony "fits" in this case.

Because of the powerful and potentially misleading effect of expert evidence, *see*

*Daubert,* 509 U.S. at 595, 113 S.Ct. 2786., sometimes expert opinions that otherwise met the admissibility requirements may still be excluded by applying Rule 403.[9] *Frazier,* 387 F.3d at 1263. Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, *see Rouco,* 765 F.2d at 995., or if the expert testimony is cumulative or needlessly time consuming. *Frazier,* 387 F.3d at 1263. Finding that admission of speculative and potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed.R.Evid. 702. *Hull v. Merck & Co., Inc.,* 758 F.2d 1474, 1477 (11th Cir.1985). The judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses. *Salem v. U.S. Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962). "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Frazier,* 387 F.3d at 1263.

## IV. DISCUSSION

A *Daubert* evidentiary hearing was conducted by the Court on February 9, 2005 to consider the testimony of Ross Buckley, Timothy Seymour, and Morris Hollander. The Government tendered Mr. Buckley as an expert on certain aspects of the banking transactions in this matter; Mr. Seymour's testimony on the pricing valuation of loans, and Mr. Hollander's testimony on accepted accounting of the transactions at issue. (Daubert Trans. at 5.)

### A. Ross Buckley

Mr. Buckley is a professor at Bond University in Sidney, Australia, teaching international finance law, international trade law, and international banking transactions at the graduate level. After receiving degrees in economics and law, he worked as an attorney for a period of three years in Australia and then with Davis, Polk and Wardwell in New York.

In his present position at Bond University, Mr. Buckley has done research in the emerging markets,[10] while obtaining a doctorate at the University of South Wales. Between the years of 1992–1999, he studied and published a book with Kluwer in London in 1999, that looked at the market from 1983–1998. Mr. Buckley testified that he has studied Russian and Latin American markets in the context of secondary training of emerging market debts. (Daubert Trans. at 7–8.)

■ The Government hired him to analyze a series of transactions and give his opinion to what the substance of those transactions were and what really happened in those transactions. The methodology and the materials reviewed to conduct his analysis were; (1) approximately 170 trade letters, (2) trade slips, (3) faxes between the parties, (4) e-mails between the parties, (5) internal memoranda from

9. Federal Rule of Evidence 403 provides: Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

10. The emerging market is the name for the middle income developing countries, for example, Russia is considered within the emerging market. (Daubert Trans. at 7.)

one party to the other, (6) the SEC's depositions, and (7) trading conversations. Further, he read the complaint of the OCC, the Government's indictment against the Defendants, and reviewed his writings, books, and articles. He also stated that he did some research on the prices of the Latin American and Russian securities, and how well the Russian press was covering the media in the United States. He specifically looked at the coverage in the Wall Street Journal and the Miami Herald. (Daubert Trans. at 9–12.)

Mr. Buckley testified that after his analysis of the materials provided by the Government for review, he concluded that the purchase and sale of the transactions were conditional upon each other. (Daubert Trans. at 10.) Mr. Buckley explained to the Court that an adjusted price trade is basically whatever data is transferred other than its market value, and the easiest way to have that happen is if there is a swap of data where data is moved from A to B and other data is moved from B to A; and because of that swap, it is possible to structure a commercially viable transaction to appear that the data is viable in the secondary market. (Daubert Trans. at 12–13.) In his opinion, the transactions were swap exchanges, that one transaction would not proceed without the other, and that they made no sense as independent transactions. (Daubert Trans. at 10–11.) The testimony he will give at trial is that, in his opinion, the City of Moscow loans were not worth their face value, (Daubert Trans. at 21) but were adjusted price trades or ratio swaps. (Daubert Trans. at 15–16.)

He reached this conclusion without researching or comparing any other financial transactions that took place back in 1998 involving the same loans that are at issue in this case (Daubert Trans. at 18) since there is no presently available information of the value of the Russian or Latin loans during the period of 1998. (Daubert Trans. at 29.) Mr. Buckley further testified that he did not, as part of his methodology, study any of the fundamentals of the city of Moscow loans, the collateral that might have been securing the loan, or the source of the re-payment of the loan. (Daubert Trans. at 18.)

Because the Government intends to have Mr. Buckley testify to "what really happened in the transactions" at issue, the Court finds that Mr. Buckley is not qualified to give opinion testimony as to what business judgment decisions the officers of Hamilton Bank engaged in at the time the transactions were made and whether or not they were lawful.

1. *Whether the methodology by which the expert reached his conclusions is reliable*

Mr. Buckley's methodology lacked the application of relevant material for the opinions he offered. For example, Mr. Buckley; (1) did not look at the fundamentals of the loans or the borrowers (Daubert Trans. at 19, 41.); (2) did not look at whether the loans were repaid (Daubert Trans. at 20.); (3) did not look at whether or not the OCC required reserves on these loans (Daubert Trans. at 21, 33.); (4) did not look at whether any payments on these loans were affected by the moratorium (Daubert Trans. at 26, 40.); (5) did not do other research on value (Daubert Trans. at 38.); and (6) did not review Hamilton Bank's portfolio (Daubert Trans. at 39.) Based on Mr. Buckley's testimony at the *Daubert* Hearing, the Court finds that Mr. Buckley's proposed testimony is merely conclusory, unreliable, and fails to specifi-

cally identify the methodology or reasoning he used to conclude that the transactions at issue are considered an adjusted price trade or a ratio swap, and that the City of Moscow loans were not worth their face value.

### 2. Whether the expert's testimony will assist the trier of fact

Based on Mr. Buckley's testimony at the *Daubert* Hearing, the Court finds that Mr. Buckley's proposed testimony will not assist the trier of fact, but merely tell the jury the result it should reach. The jury is certainly capable of listening to the testimony and arguments of experienced lawyers, reviewing the evidence, and deciding whether the transactions constituted simply a swap of securities for value.

The *facts* of the case are relatively straightforward. There is nothing complicated about the times, dates and amounts of the purchase and sale of the Russian and Latin American loans made by Hamilton Bank, or the reports Defendants filed with government agencies. These *facts* do not require an "expert" opinion for an average juror to fully understand after listening to the closing argument of counsel and the Court's instructions on the law.

Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. *Frazier*, 387 F.3d at 1263–64.

### B. Timothy Seymour

■ Mr. Seymour is a an investment banker and stock trader. In 1994 he graduated from Fordham Business School with a Masters in Business Administration in International Finance and began work as a high grade debt analyst on emerging markets. After working for UBS Corporation for three years, he began working for Troika Dialog ("Troika"), a Russian security bank located in Moscow, Russia where he oversaw five salespeople engaged in open market trading of Russian debt securities.

Mr. Seymour was retained by the Government to testify to the price range of certain securities in 1998 in Russia.

Mr. Seymour testified that the methodology he used, and the materials he reviewed to conduct his analysis of the transactions at issue were; (1) the Government's indictment (2) his own documents, (3) industry resources, and (4) price data points. (Daubert Trans. at 51.)

Mr. Seymour testified that the documents that he relied on to reach his conclusions were data bases like Bloomberg,[11] Reuters,[12] his propriety records from Troika, trading blotters, analysis that he has maintained, and industry reports from other big international banks such as IMG and Solomon Brothers that were prevailing reports in the market at that time. (Daubert Trans. at 52.) He also stated that in reaching his conclusion, he spoke specifically to market participants, and fund managers in the market at that time who were clients and who were buyers and sellers of Russian securities back in 1998, and more specifically he spoke to them about the City of Moscow debt, the Gazprombank, the Mezhcombank and the Vneshtorgbank. (Daubert Trans. at 53.)

He has concluded that the securities in question were trading at some relative ba-

---

**11.** Bloomberg is an industry source of both news and data, historical and current.

**12.** Reuters is an industry data base source of information and news.

sis substantially lower than the prevailing benchmark debt in Russia. (Daubert Tans. at 54.) Mr. Seymour was prepared to testify that it would have been impossible for this debt to be traded at par (100 cents on the dollar) or face value in the market at that time without some type of structured transaction because the market was distressed. (Daubert Trans. at 54–55.)

Mr. Seymour stated that the value of similar securities to the securities at issue, that were bought and sold in 1998, went down dramatically because of the environment at the time and because of the increased risk in trading these securities. (Daubert Trans. at 55–56.) He testified that when he looked at the price sheets [13] during the 1998 period, he found that general securities at that time were traded at roughly 17 cents to 60 cents on the dollar. (Daubert Trans. at 57–59.) Mr. Seymour explained to the Court that in the beginning of 1998, during the months of January and June, similar loans to the loans at issue were trading in a range of 50 cents to 75 cents on the dollar, and during August through September, similar loans were trading at a range of 5 cents to 10 cents on the dollar, and during the last few months of the year, similar loans were trading at a range roughly of anywhere up to 60 cents on the dollar. (Daubert Trans. at 59–61.)

On Defendants' cross examination of Mr. Seymour, he stated that he did not, and does not have any formal training in value analysis. (Daubert Trans. at 65.) He further testified that he has never taught a course, or published any materials in relation to value analysis. (Daubert Trans. at 65.) In addition, he admitted that he has no formal training in analyzing the fundamentals for securities in relation to sources of repayment or collateral. (Daubert Trans. at 66.) Mr. Seymour agreed that in terms of one valuing notes or pieces of paper, he is not a professional, and he has no formal training in that particular field. (Daubert Trans. at 67.)

Mr. Seymour, during cross examination, explained to the Court that the best way to value the paper/loans that Hamilton Bank traded, was for one to evaluate the creditworthiness of the issuer; but he admitted that when conducting his analysis, he did not perform a study on the creditworthiness of the issuers of any of the four Russian loans at issue in this case. (Daubert Trans. at 80.) Further he stated that the analysis he used to produce his report for this case, did not include the value of the four Russian loans, what they were selling for, or what the buyers were willing to pay for them. (Daubert Trans. at 69.)

He testified that his research showed that there was proof of some trades such as promissory notes and syndicated notes that took place in the Russian market, but there was no proof any trades involving the notes or loans that are at issue in this case. (Daubert Trans. at 73–74.) He further stated that after conducting his research on the loans at issue, he could not find any data from the year 1998 that showed proof of actual trades by other entities who were holding the same paper/loans that Defendants had transacted in this matter. (Daubert Trans. at 77–78.) In addition, Mr. Seymour explained to the Court that his studies indicated that at the time in which Hamilton Bank determined the price of other transactions similar to

---

13. Price sheets are historical references of where certain securities were trading on a

particular day.

the ones they conducted, there were no published bids on the market for comparison purposes. (Daubert Trans. at 82–83.)

In conclusion, Mr. Seymour agreed that after conducting research on the issue, he could not provide the Court with any records indicating that the Russian loans in this case were being traded at 6 cents on the dollar, and he could not find the specific and actual amount the loans at issue were traded because the value of these loans were never recorded. (Daubert Trans. at 69.)

He said the best test of value was what a willing buyer would pay for the security.

In determining the admissibility of the proposed expert testimony under Rule 702 of the Federal Rules of Evidence, the trial court considers the same three-part legal inquiry set forth above.

Based on Mr. Seymour's testimony at the *Daubert* Hearing, the Court finds that Mr. Seymour's proposed testimony is merely conclusory, and, unreliable. The methodology he used to reach his opinion is not scientifically valid as applied to the facts of this case

As stated above, proffered expert testimony will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. *Frazier*, 387 F.3d at 1263–64. Admission of speculative and potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed. R.Evid. 702. *Hull*, 758 F.2d at 1474.

Based on Mr. Seymour's testimony at the *Daubert* Hearing, the Court finds that

Mr. Seymour's proposed testimony will not assist the trier of fact. It is simply his opinion of what he would do if he were a juror considering the facts which need no interpretation by an "expert."

Lay jurors can certainly understand the facts of this case, i.e., that Hamilton Bank sold and bought securities to apparently willing buyers and from willing sellers. If the Government has factual evidence that the transactions were not "arms length" or by unwilling buyers or sellers, they can certainly produce such *factual* testimony. The jurors, after hearing the facts and closing argument can make a just determination on these straight forward facts, without the conclusionary opinions of "experts."

## C. *Morris Hollander* [14]

 Mr. Hollander is a certified public accountant. (Daubert Trans. at 97.) He graduated from Wilkes–Barre University, and has worked as an accountant in firms such as Laventhal & Horwarth, S.D. Legdorph and Company, Ernest and Young, Rachlin & Cohen, Mellon Weinberger & Company, and Kaufman Roslin & Company. (Daubert Trans. at 98–99.) Mr. Hollander has served on accounting committees of the Florida Institute of Certified Public Accountants, the American Institute of CPAs, and the Auditing Standards Board. (Daubert Trans. at 102–103.)

Mr. Hollander specializes in the area of accounting and auditing, and served as an auditor for companies whose securities are

---

**14.** At the conclusion of the *Daubert* Hearing, the Court conditionally excluded the testimony of Mr. Hollander as being unhelpful to the jury without prejudice to the Government requesting reconsideration at the time of trial if it establishes certain factual predicates for the admission of the testimony. However, the Court will fully analyze the issue of whether under *Daubert*, Mr. Hollander may testify as an expert at trial.

publicly held and publicly traded. He also reviews the quarterly 10–Q filings [15] that public companies are required to file with the SEC. (Daubert Trans. at 100.)

Mr. Hollander stated that the methodology that he used in forming an opinion was "to use standard procedures that are guided by our professional standards dealing with engagements of this nature." He reviewed all of the public filings, the SEC filings, the form 10–Qs, 10–Ks, minutes and documents of Hamilton Bank's audit committee, and documentation relating to transactions that Hamilton Bank had transacted with West Merchant Bank and with Standard Bank. (Daubert Trans. at 106.) Based on the methodology he used in his analysis, Mr. Hollander concluded that in 1998, in connection to the Russian loan transaction, Hamilton Bank should have reflected a 8.6 million dollar net loss, instead of a 5.6 million dollar net income. (Daubert Trans. at 107–108.) He also concluded that in 1999, in connection with the AHMSA notes transaction, Hamilton Bank should have reflected a 3.2 million dollar net loss, instead of a $736,000 net loss. (Daubert Trans. at 108.)

During cross examination, Mr. Hollander agreed that the generally recognized accounting practice leave it to corporate management to choose among different reasonable alternatives for accounting treatment and exercise of judgment. (Daubert Trans. at 132.) He stated that as long as management uses reasonable judgement, complies with various requirements documenting its intent, as well as its ability to hold securities to maturity, two institutions can have the same transaction

and treat it in different ways, and both might be reasonable alternatives as long as management uses reasonable judgment. (Daubert Trans. at 132–133.)

Mr. Hollander testified that he is not a valuation expert, and that he did not conduct an independent analysis of the value of any of the loans in this case. (Daubert Trans. at 124, 127.) However, even though Mr. Hollander admitted that he was not a valuation expert, and that he did not conduct an independent analysis of the value of any of the loans in this case, he concluded that Hamilton Bank was engaged in an adjusted price trade/ratio swap, which caused the sale of the loans to be at an inflated value. (Daubert Trans. at 116–117.) On cross examination of Mr. Hollander, admitted that he did not know whether any of the loans at issue in this case had quoted market prices in active markets. After reviewing the documents he was of the opinion that a good degree of judgment was involved in estimating the fair value of the instruments. (Daubert Trans. at 133.)

Mr. Hollander stated that after reviewing Hamilton Bank's records, the loans were reported on its 10–Qs were at the initial/historical cost that Hamilton Bank paid for them. (Daubert Trans. at 112.) Mr. Hollander agreed that if an institution buys a loan and intends to hold it to maturity, that that institution's accounting treatment of the loan may be different than an institution which buys a loan and classifies it as available for sale or for trading purposes. Mr. Hollander conceded that he did not know whether Hamilton Bank held its loans to maturity,

---

**15.** Quarterly filings are called 10–Q reports. They entail a summarized financial statement giving the quarterly results of operations for the issuer, for the company, together with year to date financial information, results of operations, as well as the financial position, and balance sheets of the company. (Daubert Trans. at 100.)

whether it would trade its loans, or whether Hamilton Bank intended to hold the Russian loans until maturity at the time of purchase. Based on Mr. Hollander's testimony at the *Daubert* Hearing, the Court finds that his testimony is merely conclusory and fails to specifically identify the methodology or reasoning he used to conclude that Hamilton Bank was engaged in an adjusted price trade/ratio swap. Further, his testimony (opinion) are not matters upon which the jury cannot easily understand without the services of an expert. It will not assist the triers of the fact.

## V. CONCLUSION

The Court finds that the proffered expert testimony of Mr. Ross Buckley, Mr. Timothy Seymour, and Mr. Morris Hollander shall be excluded because their proposed testimony does not meet the strict requirements for admissibility of *Daubert* and will not assist the trier of fact. This opinion testimony, if permitted, would invade the province of the Court to instruct the jury on the law, and usurp the function of the jury to decide the issues in the case. Counsel can, and should, argue their theory of the case based on the perfectly clear and understandable facts of the case.

Accordingly, after a careful review of the record and the Court being otherwise fully advised, it is ORDERED and ADJUDGED that Defendants' Motion to Exclude Expert Testimony (DE # 167) be, and the same is hereby, GRANTED. Mr. Ross Buckley, Mr. Timothy Seymour, and Mr. Morris Hollander will not be permitted to testify at the trial in the above-action.