**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0229
Luis Cayamcela, M.D.
v.
Advocacy Trust, LLC et al

and

No. S26A0242
Hospitalist Services of Georgia P.C.
v.
Advocacy Trust, LLC et al

On Appeal from the Superior Court of Rockdale County
No. 2021-CV-1902

Argued: February 3, 2026 — Decided: June 16, 2026

PINSON, Justice.

Holly Baumstark died in the hospital after giving birth to her daughter by cesarean section. Her fiancé (as administrator of her estate) and a conservator for her children sued several doctors and their medical practices, the hospital where Baumstark was treated, and other entities for medical malpractice resulting in wrongful death. Most of the defendants settled, leaving only one doctor and a medical staffing agency as defendants. After a trial, the jury found those defendants liable and awarded damages for pain and suffering to Baumstark's estate and damages for wrongful death to her children. On appeal, the defendants claim that an

evidentiary error and an instructional error each require a new trial; that the trial court erred in declining to apply OCGA § 51-13-1's cap on noneconomic damages in medical malpractice cases to the jury's damages award; and that the trial court further erred in awarding attorney fees under OCGA § 9-11-68. For the reasons set out below, the judgment is affirmed.

I. *Background*

(a) In 2019, 27-year-old Holly Baumstark was pregnant with her second child. During her pregnancy, Baumstark was diagnosed with placenta previa, a condition where the placenta "covers all or part of the opening in the cervix." This put her at a higher risk for developing another condition called placenta accreta spectrum (PAS) when "the placenta grows through the intrauterine wall," essentially attaching to something outside of the uterus such as another organ. A patient with PAS is at risk for hemorrhaging.

That July, Baumstark gave birth to her daughter by cesarean section (or "C-section") at Piedmont Rockdale Hospital. During delivery, it became clear that Baumstark had developed PAS and she suffered a "massive hemorrhage." To control the bleeding, Dr. Meredith Delp, the obstetrician who performed Baumstark's C-section, proceeded with an emergent hysterectomy. After several hours of surgical repairs,[1] Baumstark was moved to the intensive care unit for close monitoring.

---

[1] Dr. Delp called in Dr. Richard Robinson, another obstetrician, for "an extra set of surgeon's hands" because Baumstark developing PAS was an "unanticipated finding." Dr. Allen Futral, a urologist, was also called in to repair damage that the placenta caused to Baumstark's bladder. The surgery lasted around five or six hours.

Appellant, Dr. Luis Cayamcela, was the doctor charged with managing Baumstark's care in the ICU. While in the ICU, Baumstark's condition declined. She went into respiratory arrest, followed a few hours later by cardiac arrest, and she died the next morning.

(b) Baumstark's fiancé, Lee Blasingame, sued (on behalf of his two children with Baumstark and as administrator of Baumstark's estate) in Rockdale County Superior Court for medical malpractice resulting in wrongful death. Later, appellee Advocacy Trust, LLC, was appointed as limited conservator for the children and was substituted as party plaintiff for the children's claims in lieu of Blasingame. At the time of trial, the only remaining defendants were appellants Cayamcela and Hospitalist Services of Georgia.[2]

At trial, the plaintiffs presented expert witness testimony about the ways Cayamcela violated the standard of care as Baumstark's doctor, including failing to ensure that additional IV access was obtained and that an arterial line was placed, failing to administer sufficient IV fluids, blood products, and medications, failing to monitor and treat Baumstark's electrolyte imbalance, and failing to recognize and inform other doctors of Baumstark's need to return to surgery due to her continued bleeding. The jury found Cayamcela and Hospitalist Services liable for Baumstark's death and returned a $42 million verdict in favor of plaintiffs. In accordance with the verdict, the trial court entered a judgment awarding $10 million to Baumstark's estate for pain and suffering

---

[2] Hospitalist Services Group is a Georgia based corporation that provides "[p]hysician staffing to third party client hospitalist groups." Cayamcela entered into a contract for "full-time employment" with Hospitalist Services Group on February 1, 2019.

3

and $32 million to her children for her wrongful death.

After trial, the defendants moved for a new trial on several grounds, including that the trial court erred by excluding certain expert testimony, and incorrectly instructing the jury on the plaintiffs' burden of proof and proximate causation. They also moved in the alternative to amend the judgment in accordance with the $350,000 cap on noneconomic damages imposed by OCGA § 51-13-1. The trial court denied both motions. With respect to the damages cap, the court concluded that the defendants had waived application of the cap by failing to mention the cap in the pretrial order and raising it for the first time after the jury returned its verdict. In the alternative, the trial court concluded that that the portions of OCGA § 51-13-1 held unconstitutional in *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt*, 286 Ga. 731 (2010*)*, could not be severed; that in any event, capping noneconomic damages for wrongful death caused by medical malpractice would violate the right to a jury trial under the Georgia Constitution; and that applying the damages cap to only noneconomic damages for wrongful death would violate equal protection and separation of powers.

For their part, the plaintiffs sought attorney fees under OCGA § 9-11-68, which entitles a plaintiff to recover reasonable attorney fees and expenses of litigation if a defendant rejects a qualifying offer of settlement and the plaintiff recovers a final judgment of greater than 125 percent of the settlement offer. After concluding that the plaintiffs had made a qualifying offer that the defendants had rejected, the trial court granted the request, awarding around $11.8 million in attorney fees.

The defendants appealed to this Court, invoking our exclusive jurisdiction over cases in which the constitutionality of a law

4

has been drawn in question. See Ga. Const. Art. VI, Sec. VI, Par. II.

## II. *Analysis*

The defendants raise four claims on appeal. They claim that the trial court erred in failing to grant them a new trial on two different bases: that the trial court erred in excluding certain expert testimony, and that it erred in giving a jury charge that shifted the burden to defendants to disprove liability. They claim that the trial court erred in declining to apply the $350,000 cap on noneconomic damages imposed by OCGA § 51-13-1 to the jury's verdict. And they claim that the trial court abused its discretion in granting plaintiffs' request for attorneys' fees. We address each claim in turn.

## A. *Expert Testimony*

The defendants claim that the trial court erred by excluding as unreliable certain testimony of one of their experts, Dr. Steven Clark, under OCGA § 24-7-702(b).[3] A decision to exclude

---

[3] Code section 24-7-702(b) provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if:

(1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(2) The testimony is based upon sufficient facts or data;

(3) The testimony is the product of reliable principles and methods; and

(4) The expert has reliably applied the principles and methods

5

evidence under Rule 702(b) is reviewed for abuse of discretion. See *Peavy v. State*, ___ Ga. ___ (2026), S26A0455, slip. op. at 9 (Ga. May 5, 2026) (2026 WL 1215837) (citing *Miller v. Golden Peanut Co., LLC*, 317 Ga. 22, 30 (2023)).

1. About a week before trial began, the defendants identified for plaintiffs several portions of deposition testimony from Clark that they wanted to use at trial. In response, plaintiffs moved to exclude or limit the use of Clark's testimony. Clark, a full-time faculty member at Baylor College of Medicine specializing in obstetrics and gynecology, was originally retained as an expert by a co-defendant doctor. After that co-defendant settled and was dismissed from the case, Cayamcela identified Clark as a possible witness for trial.

After some back and forth, the defendants indicated that they would seek to introduce only two parts of Clark's testimony that plaintiffs took issue with. The first portion of that testimony was Clark's answer to a compound question about when the standard of care required taking Baumstark back into surgery while in the ICU, and whether she was stable enough to do so. The second portion of that testimony was Clark's statement that he knew "[Delp's] violations of the standard of care and nothing else" "resulted in the death of Ms. Baumstark." The trial court granted the plaintiffs' motion to exclude the testimony, concluding that the testimony was not supported by sufficient evidence of reliability because Clark testified that he hadn't reviewed parts of Baumstark's ICU records "well enough" to "know enough information" to answer questions about details of her care in the ICU.

to the facts of the case.

6

2. The defendants contend as an initial matter that the trial court erred by waiting to exclude Clark's testimony until after the final pretrial conference contemplated under OCGA § 9-11-16. See OCGA § 24-7-702(d) (allowing the court to hold a pretrial hearing to determine if a witness qualifies as an expert and whether the expert's testimony satisfies Rule 702, but requiring the hearing and any ruling to be "completed no later than the final pretrial conference contemplated under Code Section 9-11-16"). But they failed to preserve this argument for appeal.[4] The defendants never argued below that the challenged testimony could not be excluded after the final pretrial conference. Absent "special circumstances" not present here, we do not consider arguments raised for the first time on appeal. *State v. Fed. Def. Program, Inc.*, 315 Ga. 319, 343 (2022).

The defendants also contend that the trial court erred in excluding the evidence as unreliable under Rule 702(b) because plaintiffs never challenged the expert's reliability under that subsection. But the plaintiffs' motion in limine expressly identified Rule 702 as one basis for its objections to Clark's testimony, and in doing so, they argued that this specific testimony was not supported by sufficient evidence of reliability.

On the merits, the defendants contend that the trial court should not have excluded Clark's testimony as unreliable.

Rule 702 requires a trial court to "assess the reliability of proposed expert testimony." *Dubois v. Brantley*, 297 Ga. 575, 580

---

[4] The defendants who went to trial did not retain Clark as an expert witness during discovery and provided the plaintiffs with the testimony they intended to use at trial seven days after jury selection and only six days before the beginning of evidence at trial. The plaintiffs moved in limine to exclude that testimony five days later.

(2015). See also *Am. Gen. Life Ins. Co. v. Schoenthal Fam., LLC*, 555 F3d 1331, 1338 (11th Cir. 2009) (explaining that a trial court must "determine that proffered expert testimony is both reliable and relevant"). In doing so, the trial court must ask whether the testimony of the expert is "based upon sufficient facts or data" and "the product of reliable principles and methods," and whether the expert "has applied the principles and methods reliably to the facts of the case." OCGA § 24-7-702(b)(2). See *McClain v. Metabolife Intern., Inc.*, 401 F3d 1233, 1255 (11th Cir. 2005) (concluding that expert testimony did not satisfy Rule 702 because their opinions "were not based on sufficient data and were not the product of reliable methods"). This role requires the trial court to act as a "gatekeeper," and the court has broad discretion to admit or exclude expert testimony under this rule. *Thelen v. Somatics, LLC*, 156 F4th 1115, 1132 (11th Cir. 2025) ("a trial court has "considerable leeway" in exercising its discretion to admit or exclude expert testimony"); *McCorvey v. Baxter Healthcare Corp.*, 298 F3d 1253, 1256 (11th Cir. 2002) ("*Daubert* requires that trial courts act as 'gatekeepers' to ensure that speculative, unreliable expert testimony does not reach the jury."). The court abuses its discretion when it fails to act in this gatekeeping capacity. See *McClain*, 401 F3d at 1238.[5]

The trial court here did not abuse its broad discretion when it excluded the challenged portions of Clark's testimony under Rule 702(b). The trial court explained in its order that Clark's testimony lacked a sufficient basis in facts and data and pointed to

---

[5] Because OCGA § 24-7-702 is based on Federal Rule 702, we look to decisions of federal appellate courts, especially the United States Supreme Court and the Eleventh Circuit, for guidance on applying it. *Miller*, 317 Ga. at 26.

Clark's "admission that he was not familiar with Ms. Baumstark's care in the critical care unit because he had not reviewed those records and was not asked to address that care." This reasoning finds at least some support in Clark's deposition testimony. During his deposition, when Clark was asked about whether certain actions would have been proper when Baumstark arrived in the ICU, Clark said things like "I just haven't looked at those records ... carefully enough, particularly the ventilation sequence"; "I don't know enough to answer that question because I haven't paid attention to that detail"; and "I don't know those records well enough because that's not what I was asked to address, so I — I don't have enough information to tell you that answer." And in response to questions about Baumstark's status in the ICU and her electrolyte levels, Dr. Clark stated that his answer "involve[d] someone whose specialty [he is] not" and that he would tell a jury "here's my opinion … but don't believe me, believe the intensivist."[6] The defendants respond that these issues with the factual basis for Clark's testimony go to its credibility, not admissibility. But the "whole premise" of Rule 702 is that the trial court "must act as a 'gatekeeper' to ensure the relevance and reliability of expert testimony." *Miller*, 317 Ga. at 29 (quoting *Dubois*, 297 Ga. at 585). See also *McCorvey*, 298 F3d at 1256; *Allison v. McGhan Med. Corp.*, 184 F3d 1300, 1310 (11th Cir. 1999) ("'Neither the difficulty of the task nor any comparative lack of expertise can excuse the judge from exercising the "gatekeeper" duties that the

---

[6] Clark seemed to acknowledge that he could not speak to the actions of all the other doctors or all parts of Baumstark's care, stating that he did "not have any formal opinions about the standard of care of anyone … who has a different specialty than I have." Clark specialized in obstetrics and gynecology; Cayamcela was an internal medicine hospitalist with training in critical care and managing ICU patients. Piedmont Rockdale had a "half open ICU, half closed," which meant that an intensivist was on duty during the day.

Federal Rules impose.'"). Even though this testimony may not have compelled a trial court to exclude the challenged testimony, it called the reliability of that testimony into enough doubt that we cannot say the trial court abused its broad discretion by excluding the testimony.

B. *Instructional Error*

The defendants claim that the trial court erred by charging the jury with an instruction that improperly shifted the burden of proof from plaintiffs to defendants. That instruction told the jury that "[t]here may be more than one proximate cause of an injury or death," and that "[t]he Defendants bear the burden of proof on their contention as to whether or not the negligence of other medical professionals was the sole proximate cause of Holly Ann Baumstark's injuries and death."

Because the defendants failed to object to this instruction at trial, our review on appeal is limited to whether there has been a "substantial error in the charge which was harmful as a matter of law." OCGA § 5-5-24(c). But as with plain error review in criminal cases, this substantial-error review is not available to a party who has induced or affirmatively waived the error. *Pearson v. Tippmann Pneumatics, Inc.*, 281 Ga. 740, 742 (2007) (citing *Moody v. Dykes*, 269 Ga. 217 (1998)) ("[I]nduced error based on a charge specifically requested by counsel or the acquiescence of counsel in the giving of a charge provides no ground for reversal under OCGA § 5–5–24(c)."). For example, in *Moody*, counsel waived an instructional error otherwise subject to review under OCGA § 5-5-24(c) when he said at the end of a charge conference, "All right. Well, then, I won't—with that, I won't object to anything. I'll accept it all." See *Moody*, 269 Ga. at 220. And in the analogous context of plain error review, we have said that "[a]n

10

affirmative waiver may occur, for example, when a defendant requests a specific jury instruction but later withdraws such request." *Vasquez v. State*, 306 Ga. 216, 229 (2019) (citing *Walker v. State*, 301 Ga. 482, 485 (2017)).

The defendants here affirmatively waived this instructional error. Before the charge conference, the defendants had proposed an instruction that stated essentially the opposite of the challenged instruction: that the defendants did *not* have any burden of proof as to whether someone else's conduct caused Baumstark's death.[7] And then, during a colloquy with the trial court, defense counsel withdrew all the defendants' proposed instructions, including that one. When the trial court asked defense counsel if he wanted to add any pattern instructions from the defendants' proposed charges; if any non-pattern charges from the defendants' list needed to be discussed; and finally, if the defendants had "anything to add to what we've have already approved," defense counsel indicated that they did not have anything to add from the defendants' proposed instructions, and he told the court that he thought their charges were "covered by the patterns." Nor

---

[7] That charge read:

If you find from all the evidence that Dr. Cayamcela was not guilty of any act of negligence or wrongdoing, a verdict in the Plaintiffs' favor is unlawful, even if the Defendants have not satisfactorily accounted for the occurrence. In other words, it is not necessary for the Defendants to prove to you what may have caused Holly Baumstark's death. If the evidence fails to show by a preponderance that Dr. Cayamcela was negligent or breached a duty owed to Holly Baumstark, then it is your duty to return a verdict in favor of Defendants, although the cause of Holly Baumstark's death may still be a matter of speculation.

11

did defense counsel speak up when plaintiffs' counsel summed up the colloquy, stating that it "[s]ounds like for the record we have an agreed charge," and the court replied, "Okay. Thank you. That is great." And on top of all that, the defendants stated at least three times in response to the court's questions that they did not have any objections to the court's proposed instructions, which included the challenged instruction. By proposing and then effectively withdrawing the opposite instruction, and then indicating multiple times that they did not have any objections to the challenged instruction, the defendants affirmatively waived this instructional error. See *Kimble v. State*, 270 Ga. 311, 312 (1998) ("A defendant who, in effect, withdraws a request to charge will not be heard to complain on appeal that the trial court erred when it failed to give the withdrawn charge."); *Smith v. State*, 260 Ga. 274, 277 (1990) (defendant was "barred" from challenging trial court's failure to give a charge when his trial counsel "acquiesced to the court's suggestion," elected one jury instruction, and "withdrew" another charge request, "all without objection").

C.  *Damages Cap*

The defendants raise a number of claims of error related to application of the statutory damages cap, OCGA § 51-13-1(b). They claim that the trial court erred in concluding that the defendants waived their request to apply that cap to the jury's verdict by failing to raise it in the pretrial order. And they claim that the trial court erred in concluding that OCGA § 51-13-1(b) could not be applied to limit the jury's verdict in this case for a number of reasons, including because applying the damages cap would violate the plaintiffs' constitutional right to a jury trial. With respect to the latter conclusion, the defendants urge this Court to overrule *Nestlehutt*, which held that applying OCGA § 51-13-1(b)'s cap to damages for pain and suffering and loss of consortium

12

in medical malpractice actions violates the right to trial by jury guaranteed by the Georgia Constitution. 286 Ga. at 738. In the alternative, they contend that even under *Nestlehutt*, that damages cap may be applied to limit damages awarded by a jury for wrongful death.

Under our decision in *Clark v. Leigh*, which also issued today, the damages cap of OCGA § 51-13-1(b) may not be constitutionally applied to the verdict in this case. ___ Ga. ___ (2026), S26A0349, slip op. at 47, 52 (June 16, 2026). In *Clark*, we held that stare decisis preserves *Nestlehutt*'s holding. See id. at 15, 45. And after applying ordinary principles of statutory construction to OCGA § 51-13-1, we held that if even part of the jury's award in a medical malpractice action was for noneconomic damages to which *Nestlehutt*'s holding applied, the statute's damages cap may not be applied to limit that award without violating the right to a trial by jury. See id. at 47–52. We summed up the problem as follows:

> [T]he cap statute's damages cap applies using a single operative mechanism: combine all the noneconomic damages awarded to all the parties into a single number and then limit that number to $350,000. No statutory text permits doing so only for some parties and some damages. So, in a case like this — where noneconomic damages to which the right to trial by jury applies are awarded as part of a jury's verdict in a medical malpractice action — there is simply no way to apply the statute's cap on noneconomic damages as written without violating the right to trial by jury.

Id. at 52. Just so here.

In light of *Clark* and the resulting conclusion that OCGA § 51-13-1's cap may not be applied to the jury's damages award here, we need not address the defendants' remaining claims seeking to apply that cap to some or all of that award.

D. *Attorney Fees*

The defendants claim that the trial court erred in awarding attorney fees at all, because the plaintiffs did not make a valid offer of settlement under OCGA § 9-11-68(a). And they contend that in any event, the court erred in awarding fees in the amount the plaintiffs' sought. We address each argument in turn.

1. *Awarding Attorney Fees under OCGA § 9-11-68*

Code section 9-11-68 was enacted to encourage tort litigants "to make and accept good faith settlement proposals [and so] avoid unnecessary litigation." *Ga. Dep't. of Corr. v. Couch*, 295 Ga. 469, 471 (2014) (quotation marks omitted). Under that Code section, if a plaintiff makes a valid offer of settlement that is rejected by defendants and later "recovers a final judgment in an amount greater than 125 percent of such offer of settlement," the plaintiff is entitled to recover "reasonable attorney's fees and expenses of litigation."[8] OCGA § 9-11-68(b)(2). A valid offer of settlement must satisfy eight requirements set forth in OCGA § 9-11-68(a).[9]

---

[8] It is undisputed that plaintiffs recovered more than 125 percent of their $3 million offer to settle as required by section (b)(2).

[9] In its entirety, OCGA § 9-11-68(a) provides:

> At any time more than 30 days after the service of a summons and complaint on a party but not less than 30 days (or 20 days if it is a counteroffer) before trial, either party may serve upon

About a year after filing suit, the plaintiffs here served the defendants with an offer of settlement under OCGA § 9-11-68.[10] The defendants rejected the offer. So, after the entry of judgment, the plaintiffs moved to recover attorney fees and expenses.[11] The trial court granted that motion and awarded just over $11.8 million in fees and roughly $216,403 in expenses under OCGA § 9-

the other party, but shall not file with the court, a written offer, denominated as an offer under this Code section, to settle a tort claim for the money specified in the offer and to enter into an agreement dismissing the claim or to allow judgment to be entered accordingly. Any offer under this Code section must:

(1) Be in writing and state that it is being made pursuant to this Code section;

(2) Identify the party or parties making the proposal and the party or parties to whom the proposal is being made;

(3) Identify generally the claim or claims the proposal is attempting to resolve;

(4) State with particularity any relevant conditions;

(5) State the total amount of the proposal;

(6) State with particularity the amount proposed to settle a claim for punitive damages, if any;

(7) State whether the proposal includes attorney's fees or other expenses and whether attorney's fees or other expenses are part of the legal claim; and

(8) Include a certificate of service and be served by certified mail or statutory overnight delivery in the form required by Code Section 9-11-5.

[10] The offer was filed by Blasingame on behalf of his children and not in his capacity as administrator of Baumstark's estate.

[11] By this point, Advocacy Trust had been substituted as limited conservator for the claims brought by Baumstark's children.

15

11-68.

The defendants contend that the plaintiffs' offer did not satisfy subsection (a)(7), which requires an offer to "[s]tate whether the proposal includes attorney's fees or other expenses and whether attorney's fees or other expenses are part of the legal claim." OCGA § 9-11-68(a)(7). But the plaintiffs' offer met this requirement. The offer explained that "Plaintiffs will be responsible for paying any attorneys' fees, costs, and expenses incurred for the claims brought." In other words, the proposal did not "include" attorney fees or expenses; instead, the plaintiffs would have paid them. And such fees and expenses were "incurred for" the claims, not "part" of them. This argument fails.

2. *Amount of Attorney Fees*

The defendants contend that the trial court also erred in calculating the amount of the roughly $11.8 million in fees. We review a trial court's decision as to the amount that comprises reasonable attorney fees for abuse of discretion. *Simmons v. Cmty. Renewal and Redemption, LLC*, 286 Ga. 6, 9 (2009)). If the court makes a legal error that "infect[s]" the exercise of its discretion, then the trial court has abused its discretion. *Rockdale Hosp., LLC v. Evans*, 306 Ga. 847, 851 (2019).

The defendants rest their claim of error on the dual premises that trial courts may not consider contingency fee agreements at all when awarding attorney fees, and that the trial court here relied "almost entirely" on the plaintiffs' contingency fee agreement. But both premises are mistaken.

For their premise that trial courts may not consider contingency fee agreements at all when considering attorney fees, the defendants rely on OCGA § 9-15-16 and our decision in *Couch*. See 295 Ga. at 471. But neither authority quite holds up that

16

premise. Code section 9-15-16 provides that when a party to a civil action seeks to recover attorney fees under a statute like OCGA § 9-11-68, "a contingent fee agreement between such party and such party's attorney shall not be admissible as proof of the reasonableness of the fees." OCGA § 9-15-16(b). But even assuming that recently enacted statute applies to the award of attorney fees here,[12] it only precludes admitting a contingency fee agreement "as proof that the requested fees are reasonable." Id. Nothing in the statute suggests that the court may not consider the agreement for other purposes, like the total fees incurred. As for *Couch*, we held there that although a contingency fee agreement is not "conclusive" and does not "bind the court" in determining the reasonable value of attorney fees, the agreement can be a "guidepost" in that assessment. *Couch*, 295 Ga. at 484.

As for the defendants' premise that the trial court relied "almost entirely" on the fee agreement, the trial court's order shows otherwise. The court explained that although the plaintiffs "prove[d] their total incurred fees by way of their fee agreement and testimony about their fee agreement," they proved the reasonableness of their fees "not by way of their fee agreement or even testimony about the agreement," consistent with OCGA § 9-15-16. Instead, the plaintiffs established the reasonableness of the requested fees through other means, including "testimony, including expert testimony, from their attorneys" that a 40-percent

---

[12] The plaintiffs here moved for attorney fees under OCGA § 9-11-68 on March 19, 2025. Code section 9-15-16 became effective April 21, 2025. And the trial court awarded attorney fees in an order issued on July 3, 2025. The trial court expressly addressed OCGA § 9-15-16 and found that the plaintiffs proved the reasonableness of their fee request "in compliance with" that statute, and the parties do not dispute whether the statute applies here.

fee was "usual or customary" and a "valid indicator" of the professional services; "hourly estimates" that were "credible and persuasive"; "expert testimony about the reasonableness of their allocation"; and a "detailed chart identifying the work performed." We see no abuse of discretion in the trial court's assessment or conclusions as to the amount of attorney fees and expenses awarded.

*Judgment affirmed. All the Justices concur.*