[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-14097

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 13, 2010
JOHN LEY
CLERK

D. C. Docket No. 03-20951-CR-AJ

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ARIADNA PUERTO,
EDUARDO ORLANSKY,
HECTOR ORLANSKY,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(October 13, 2010)
ON PETITION FOR REHEARING
AND  REHEARING EN BANC

Before O'CONNOR,*Associate Justice Retired, CARNES and ANDERSON,
Circuit Judges.

_____

*Honorable Sandra Day O'Connor, Associate Justice (Retired) of the United States Supreme
Court, sitting by designation.

PER CURIAM:

No Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc (Rule 35, Fed.R.App.P.), the Petition for Rehearing En Banc is DENIED. Turning to Eduardo's subsidiary petition for panel rehearing, we deny panel rehearing, but acknowledge the need to modify Part II.F.1. of the panel opinion, issued on August 12, 2010. In his petition for rehearing, Eduardo argues for the first time that the district court and the panel opinion inappropriately relied upon the testimony of Dr. Gelblum and Dr. Crown that, because neither they nor others examined or tested Eduardo earlier, they could not opine with any degree of medical certainty that at the relevant times Eduardo lacked the requisite mens rea or lacked the ability to appreciate the nature and quality or wrongfulness of his acts. Eduardo's new argument is that Fed.R.Evid. 704(b) precludes any expert opinion on such ultimate issues, and that the district court and the panel opinion erred in requiring same. Eduardo now argues also that the district court and the panel opinion erred in requiring that there should have been contemporary mental health examinations or tests. We reject Eduardo's new argument. Neither the district court nor the panel opinion imposed a requirement that, to be admissible, a mental health expert must testify as to the ultimate issue, or a requirement that there be mental health examinations or tests during the relevant

2

time period. Obviously, there is no requirement that there shall have been mental health examinations or tests during the relevant time period. We are in full agreement with the Fifth Circuit in United States v. Long, 562 F.3d 325 (5th Cir. 2009), when that court said:

> Obviously, neither Dr. Friedberg nor any other expert examined Long during the commission of the crimes, and in any event, would have been prevented under Federal Rule of Evidence 704(b) from offering a direct assessment of Long's ability to appreciate the nature, quality, and wrongfulness of his acts *at the times he committed them*. This necessitates some degree of inference based on the characteristics of Long's illness at the time that he was examined and Long's own report of his mental state and motivation at the time that he acted.

Id. at 342 (Italics in original; footnote omitted).

Rather than imposing a requirement that a mental health expert testify as to the ultimate issue, the district court construed the doctors' candid admissions as indicating that there was simply a paucity of evidence to conclude that Eduardo's mental deficiencies existed at the times of the crimes. In other words, there was a paucity of evidence for the doctors to opine with any degree of medical certainty about the level or degree of Eduardo's mental deficiencies at the relevant times. Thus, the district court found that "neither Dr. Gelblum nor Dr. Crown are able, with any degree of medical or scientific certainty, to opine that Mr. Orlansky suffered from dementia with significant cognitive loss during the time period."

3

District Court Order, Doc. 625, at 1. We cannot conclude that the district court abused its discretion in this regard. Indeed, although the doctors did at some points testify (without objection) that they were unable to opine with the requisite medical certainty about the ultimate issues, they also repeatedly disavowed any ability to opine generally as to Eduardo's state of mind or the degree of Eduardo's mental deficiencies at the relevant times or the date of onset of any significant cognitive loss.[*]

The district court's interpretation of the doctors' admissions and its conclusion that there was a paucity of evidence with respect to Eduardo's mental deficiencies at the relevant times are amply supported in the record. There was no history of mental deficiencies. No such complaint had ever been communicated to any doctor, or to anyone else, prior to Eduardo's indictment. In light of the admissions of the doctors that their examinations and tests were insufficient, the only evidence in any way suggesting mental deficiencies at the relevant times was

---

[*] Such testimony is not prohibited testimony on the ultimate issue. As the Fifth Circuit in Long said: "Appropriate testimony . . . should 'describe the characteristics of [the defendant's] mental illnesses and the effect of such illnesses on his ability to appreciate wrongdoing.'" Id. at 333. In short, appropriate testimony includes testimony about "mental state and motivation." Id. at 334. See also United States v. Alexander, 805 F.2d 1458, 1463 (11th Cir. 1986) (in discussing the prohibition on expert testimony on the ultimate issue, Fed.R.Evid. 704(b), we commented: "Psychiatrists, of course, must be permitted to testify fully about the defendant's diagnosis, mental state and motivation . . . at the time of the alleged act so as to permit the jury or judge to reach the ultimate conclusion.").

the testimony of Eduardo's wife and a couple of employees in the business. Eduardo's wife testified vaguely at the <u>Daubert</u> hearing that he had begun to act strangely, and that she had noted a decline in his intelligence and memory. An employee, Mendez, testified at trial about some ritualistic behaviors and about Eduardo's poor business judgment and trouble understanding financial documents. However, Eduardo never adduced pertinent expert testimony as to the significance of such testimony. With respect to the two cursory emails from Dr. Gelblum and Dr. Crown referring to that testimony, the district court concluded that the emails were "conclusory and provided little to no basis for the opinions offered." After exhaustive exploration of, and hearings on, Eduardo's medical evidence, the district court effectively concluded that any opinions of Dr. Gelblum or Dr. Crown about Eduardo's mental state during the relevant time period would be mere speculation. We cannot conclude the district court abused its discretion in this regard. Accordingly, Eduardo's petition for panel rehearing is denied. However, because certain loose language in the panel opinion might contribute to the misinterpretation adopted by Eduardo in his petition for rehearing, we modify Part II.F.1. of that opinion (relating to the discussions of the Insanity Defense Reform

Act ("IDRA"), and relating to Fed.R.Evid. 702 and <u>Daubert v. Merrell Dow</u>

<u>Pharm.</u>, 509 U.S. 579, 113 S. Ct. 2786 (1993)) to read as follows.[**]

## II.  DISCUSSION

### F.  Eduardo's Mental State

1.  Eduardo's challenge to the district court's exclusion of his experts' mental health testimony

Eduardo sought to introduce evidence about his diminished mental state during the relevant time period for three reasons.  The first was to support his insanity defense under the Insanity Defense Reform Act ("IDRA"), 18 U.S.C. § 17 (2000).  Second, he sought to introduce the evidence as a means of challenging the Government's argument that he had the requisite mens rea to commit the charged crimes.  Third, he sought to introduce evidence of his diminished mental state to support his claim that he had been kept in the dark about the fraud and it had been orchestrated by lower level management.

Eduardo submitted a Notice of Insanity Defense and Expert Evidence of Mental Condition, which included reports from neuropsychologist Dr. Barry Crown and neurologist Dr. Jeffrey Gelblum (Eduardo's treating neurologist).  He also included the report from an MRI, which reportedly showed evidence of an old

---

[**]  All other parts of our opinion issued on August 12, 2010, remain unchanged.

stroke in his left caudate nucleus and a large, "very old" fluid accumulation in his left temporal and temporal frontal region, which probably resulted from a stroke. In response, the Government moved to exclude evidence that Eduardo suffered from a mental defect, for a Daubert[8] hearing, and to exclude the testimony of the two doctors. The district court excluded the testimony of the two doctors both because it was inadmissible under the IDRA and because it was inadmissible under Fed. R. Evid. 702 and Daubert. Eduardo challenges both rulings; we address each in turn.

a. The legal standard under the IDRA

Under the IDRA, insanity is an affirmative defense that the defendant must prove by clear and convincing evidence. 18 U.S.C. § 17; United States v. Westcott, 83 F.3d 1354, 1357 (11th Cir. 1996). The Act restricted the definition of insanity:

> at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

18 U.S.C. § 17(a). Before the Act's passage, a defendant could also assert a valid defense if he was unable to conform his conduct to the requirements of the law. United States v. Freeman, 804 F.2d. 1574, 1576 (11th Cir. 1986). However, as the

---

[8]     Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993).

second sentence of the Act recites, Congress prohibited the use of "'non-insanity' psychiatric evidence that points toward 'exoneration or mitigation of an offense because of a defendant's supposed psychiatric compulsion or inability or failure to engage in normal reflection.'" United States v. Cameron, 907 F.2d 1051, 1066 (11th Cir. 1990). "Congress intended to prohibit the presentation of evidence of mental disease or defect, short of insanity, to excuse conduct." Westcott, 83 F.3d at 1357-58. In passing the IDRA, Congress considered that such prohibited evidence would, if allowed to go to the jury, resurrect the former, broader version of the insanity defense "in the guise of showing some other affirmative defense, such as . . . diminished responsibility . . . and open the door, once again, to needlessly confusing psychiatric testimony." Cameron, 907 F.2d at 1066 (quoting S. Rep. No. 98-225, 98th Cong., 2d Sess. 229 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3411) (internal punctuation omitted). However, we have held that Congress did not intend to exclude the use of psychiatric evidence that negated specific intent. Westcott, 83 F.3d at 1358; Cameron, 907 F.2d at 1066-67.[9] We examine the testimony of each of the proffered experts in turn.

---

[9] The distinction mentioned in the case law between psychiatric evidence that negates specific intent, on the one hand, and psychiatric evidence that a defendant does not have the capacity to form specific intent, on the other hand, is not relevant in this case. See Westcott, 83 F.3d at 1358; Cameron, 907 F.2d at 1066-67; see also United States v. Pohlot, 827 F.2d 889, 903-05 (3d Cir. 1987).

8

i. Dr. Jeffrey Gelblum

Eduardo's treating neurologist testified at the four-day hearing in November 2005 about his diagnosis of Eduardo, the etiology of Eduardo's illness, and his opinion about Eduardo's mental state. He testified that he had diagnosed Eduardo in 2004 with progressive vascular dementia based on reports by his family of deficits in activities of daily living and an MRI and an electroencephalogram ("EEG"), neurological tests that pinpoint the dementia's causes. The MRI showed that a region in Eduardo's brain's left hemisphere was cavitated out, meaning that the brain tissue had been replaced with fluid. Dr. Gelblum testified that Eduardo had significant damage to the left temporal lobe, the left frontal lobe, and the left parietal lobe, which suggests interference of brain functioning in a critical part of the brain. He explained that the left side of the brain primarily controls right-sided body function, as well as comprehension, arithmetic, executive planning, and fluency. Memory is also impaired with this type of injury, with short-term memory being most prominently affected because it is relegated to the left temporal lobe.

Dr. Gelblum opined that the damage to Eduardo's brain was caused by an arachnoid cyst and superimposed stroke syndrome. Arachnoid cysts are congenital, meaning that the patient was born with the cyst, and Dr. Gelblum explained that superimposed stroke syndrome refers to small, "silent" strokes. While the MRI

9

could not give an exact date of onset, Dr. Gelblum speculated that the degree of whiteout in the brain suggested that the damaged area had been fluid-filled for "six, seven, [or] eight years." But he conceded that because he did not have access to previous MRIs, he could not determine if the cyst had been growing or if it had been that size since birth; the MRI and the EEG could only provide a snapshot of the patient's current condition.

At the time that Dr. Gelblum began to treat Eduardo, in May 2004, Dr. Gelblum thought that Eduardo was legally insane. However, he testified that there is no scientifically valid way for him to ascertain Eduardo's mental state before that time. Additionally, he agreed that talking to family about the patient's past behaviors could not scientifically determine the patient's mental state in years past. When asked if there was any scientifically reliable way of determining if Eduardo had the capacity to deceive during the period from 1994 to 2003, Dr. Gelblum answered "we don't have those scans or studies, no."

Because Dr. Gelblum testified that he relied upon the reports of family and friends to make diagnoses, Eduardo introduced evidence from Eduardo's wife, Jane, and later trial testimony from his former employee, Mendez. Jane Orlansky testified that Eduardo had begun to act strangely beginning in 1992 or 1993, engaging in what she termed ritualistic behavior. She also noted a decline in his

10

intelligence and short term memory. However, she testified that she did not recommend to him that he seek any professional or medical help for the strange behavior that he began to exhibit. Similarly, Mendez testified to Eduardo's ritualistic behavior. Although Jane Orlansky's and Mendez's testimony may have suggested that Eduardo was beginning to develop dementia during the time period at issue, Dr. Gelblum did not testify that, on the basis of the testimony of Jane and Mendez, he could opine with any degree of medical certainty about Eduardo's state of mind at the relevant time period such that a fact-finder could infer that Eduardo was unable to appreciate the nature and quality or wrongfulness of his actions during the relevant time period.[10]

While Dr. Gelblum testified that accounts from family of behavior and patient history comprise ninety-five percent of the information required for diagnosis, as the district court noted, Dr. Gelblum did not state that he relied on those accounts in his letters or reports when he wrote that, at the time of the crimes, Eduardo suffered from severe mental defect such that he could not appreciate the wrongfulness of his actions. And he affirmatively testified that he could not render

---

[10] Furthermore, one of the Government's experts, Dr. David Fishbain, reviewed Eduardo's business writing, correspondence and notes made from 1996 to 2003 and discerned no signs of mental or cognitive deterioration. Additionally, Dr. Fishbain noted that Eduardo made no complaints about forgetfulness, anxiety or being upset to his primary care physician until late 2004, after he was being treated by Dr. Gelblum and after he had been indicted.

11

an opinion about Eduardo's ability or capacity to lie during that period. Although he did try to rectify his opinion by testifying that he could rely on family reports to make a retroactive diagnosis, he did not testify that he could opine with any degree of medical certainty that Eduardo was unable to lie or deceive at the time of the crimes.

ii. Dr. Barry Crown

Dr. Crown is a neuropsychologist who administered a series of psychological tests to Eduardo in order to ascertain the severity of the damage caused by the arachnoid cyst and the stroke syndrome identified by the neurologists. His report stated that he would testify that at the time of Eduardo's involvement in the criminal acts, Eduardo was suffering from vascular dementia with significant cognitive loss. Further, he wrote, Eduardo, "at best, would have been performing at a twelve year old level" on his language-based critical thinking and abstract problem-solving ability.

During the hearing, Dr. Crown testified that all of the tests he administered to Eduardo only showed Eduardo's capabilities at the time of the tests' administration. When asked specifically if he could testify as to Eduardo's mental condition during the relevant period of the case, he stated that could not provide an opinion. He testified that his statement in the report was based on his

12

understanding that Eduardo was not in the acute stage of the illness and that his illness had been progressing for some time. However, he admitted that he had no way to "date stamp it," and that the rate of decline varies by individual. The district court then asked Dr. Crown if he could say "to any degree of medical certainty when that significant cognitive loss occurred?" Dr. Crown replied: "No, other than Mrs. Orlansky relating to me that she felt that he deteriorated, and that there were problems at or about the time of a civil lawsuit that took place well over ten to 12, 14 years ago. But that's the only historical bit of information that I have that suggests a point of noticeability." Finally, when asked if he could state with any degree of scientific certainty that Eduardo was insane at any point during the ten-year period that the charge embraced, Dr. Crown answered no.

### iii. Analysis

The district court properly noted that the IDRA allows a defendant to put on an affirmative defense that, as a result of a severe mental disease or defect, he was unable, at the time of the commission of the acts constituting the offense, to appreciate the nature and quality or the wrongfulness of his acts. 18 U.S.C. §17(a). We also noted above that in the IDRA, Congress intended to prohibit the use of non-insanity psychiatric evidence that points to exoneration or mitigation of an offense, but that Congress did not intend to exclude the use of psychiatric evidence

13

that negated specific intent. <u>Westcott</u>, 83 F.3d at 1358; <u>Cameron</u>, 907 F.2d at 1067. However, the IDRA specifically requires that such evidence focus on the defendant's state of mind at the time of the charged offense. See <u>Cameron</u>, 907 F.2d at 1067 ("Evidence offered as psychiatric evidence to negate specific intent is admissible, however, when such evidence focuses on the defendant's specific state of mind at the time of the charged offense.") (internal quotations omitted).

Eduardo's problem is that neither Dr. Gelblum nor Dr. Crown could provide testimony about what Eduardo's state of mind was at the time of the charged acts. At most, they could speculate that he had begun to decline during that period, but they could not opine with any degree of medical certainty about Eduardo's state of mind (or the level or degree of his mental deficiencies) during the relevant time period.[***] Moreover, because they did not know what his mental state was during

---

[***] In his petition for rehearing, Eduardo argues for the first time that the district court erred by insisting that, to be admissible, Dr. Gelblum and Dr. Crown would have to have testified to the ultimate issue – i.e., that Eduardo lacked the ability at the relevant time to appreciate the nature and quality or wrongfulness of his acts. Eduardo now argues that the district court erred in insisting upon testimony on the ultimate issue because such testimony is prohibited by Fed.R.Evid. 704(b). Although it is true that the doctors did at some point testify without objection that they were unable to opine with any degree of medical certainty as to that ultimate issue, they also repeatedly testified to a similar inability to opine generally with respect to Eduardo's mental state at the relevant times (including the timing of significant cognitive loss). The district court construed the doctors' candid admissions as indicating that there was a paucity of evidence with respect to Eduardo's state of mind at the relevant times, such that the two doctors could not opine with the requisite medical certainty that Eduardo suffered from dementia with significant cognitive loss during the relevant time period. We cannot conclude that the district court abused its discretion in this regard.

14

the relevant time, they also could not opine with any degree of medical certainty with respect to his mens rea during the relevant time period.  For this reason, the district court held that the IDRA rendered  the testimony of the two doctors inadmissible.

The district court (Judge Adalberto Jordan) exhaustively explored this evidence and its admissibility.  First it held a four-day hearing in November 2005, during which it actively questioned the experts and after which it produced two well-reasoned and comprehensively analyzed orders excluding the evidence. Additionally, the court undertook reconsideration of the decision mid-trial and again determined that the evidence could not meet the IDRA's standards.[11]  In view

---

[11]     Eduardo moved again mid-trial seeking reconsideration of the district court's decision to exclude the testimony of the doctors.  Eduardo relied on the trial testimony of employee and co-conspirator Mendez about Eduardo's behavior during the relevant time, to wit: that some of Eduardo's business decisions made no sense; that he had trouble understanding financial documents; that he had memory problems; and that he engaged in some ritualistic behaviors.  The FBI statement of another employee also reported ritualistic behaviors, like repeatedly putting out his cigarette by pressing it against the bottom of the ashtray for an inordinate amount of time.  Eduardo did not proffer sworn testimony of either doctor to the effect that the new evidence would permit them to testify with any degree of medical certainty as to Eduardo's state of mind as of the relevant time period.  However, Eduardo did proffer brief emails from the two doctors.  The district court concluded that the emails were "conclusory and provide little to no basis for the opinions offered."  We have considered the testimony of Mendez and the statement of the other employee as well as the emails.  We cannot conclude that the district court abused its discretion.  The emails are conclusory; they fail to explain how the actions described would indicate either the timing or the degree of any cognitive impairment. Moreover, especially in the absence of expert testimony, we doubt that the behaviors described could indicate cognitive impairment to a degree that mens rea would be negated.  For example, the most significant behaviors – poor business judgment and trouble understanding financial documents – would not seem to indicate cognitive impairment to the extent that a person would not realize that it is wrong to fabricate accounts receivable in order to mislead one's lender and

of the careful and comprehensive consideration by the district court,[12] and because neither doctor could testify with any degree of medical certainty about Eduardo's state of mind at the relevant times we cannot conclude that the district court abused its discretion in excluding the testimony of Dr. Gelblum or Dr. Crown.[13]

b. Rule 702 of the Federal Rules of Evidence

The district court also denied admission of the testimony based on Rule 702 of the Federal Rules of Evidence, which controls the admission of expert testimony. It provides:

---

joint venture partner. In any event, in the absence of expert testimony to that effect, we cannot conclude that the district court abused its discretion. We also note that after his indictment, Eduardo's own doctors initially opined that Eduardo was competent to stand trial.

[12]    In addition to the hearings the district court held on the evidence of Eduardo's mental state, it held a four-day hearing on the related issue of Eduardo's competency before trial began and ordered both an in-patient evaluation and an independent expert evaluation of Eduardo's competency. Moreover, as discussed below, the court re-examined Eduardo's competency both during the trial and after it, producing detailed analyses of the experts' testimony and demonstrating an extensive understanding of Eduardo's mental condition.

[13]    We noted above in Part II.F.1 that Eduardo sought to introduce the testimony of the two doctors for three purposes: first, to support his insanity defense; second, to negate mens rea; and third, to support his claim that he had been kept in the dark about the fraud. The district court's opinions, and our own opinion in the text above, specifically address the issue only with respect to its use to support the insanity defense, and to negate mens rea. However, the same rationale applies with equal force to Eduardo's attempt to use the evidence to support his claim that he had been kept in the dark about the fraud. We can assume arguendo, but we expressly do not decide, that the IDRA would not present an absolute bar to the use of psychiatric evidence for this third purpose. However, even assuming that, it is clear that the IDRA would require that the evidence be focused on defendant's state of mind at the time of the crime. Because the evidence of the two doctors was not thus focused, the district court did not abuse its discretion in implicitly holding that the IDRA renders the evidence inadmissible for this third purpose also.

16

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court has instructed that Rule 702 compels the district courts to perform a critical "gatekeeping" function concerning the admissibility of expert scientific evidence. Daubert v. Merrell Dow Pharm., 509 U.S. 579, 589 n.7, 597, 113 S. Ct. 2786, 2795 n.7, 2798 (1993). "This function 'inherently require[s] the trial court to conduct an exacting analysis' of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002)).

This court employs a three-part inquiry to determine admissibility under Rule 702. The trial court must consider whether:

(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

17

Frazier, 387 F.3d at 1260. Here, the district court denied admissibility of the testimony of Doctors Gelblum and Crown based on the second and third prongs of the inquiry, reliability and assistance to the trier of fact. While the Court in Daubert recognized that "it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty," it held that "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." 509 U.S. at 590, 113 S. Ct. at 2795. "Proposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." Id. Further, assistance to the trier of fact is primarily a question of relevance. Id. at 591, 113 S. Ct. at 2795. Therefore, the question is whether the evidence will help the jury decide a factual dispute; "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. at 591-92, 113 S. Ct. at 2796.

As discussed in reference to the IDRA, there did not exist "'good grounds,' based on what is known." Neither of the proposed expert witnesses could testify with any medical certainty to evidence with respect to Eduardo's state of mind at the relevant times that would allow a reasonable fact-finder to conclude that Eduardo was either insane at the time of the offenses or lacked the requisite mens

18

rea at the time of the offenses.[14]   Therefore, the district court's conclusion that the evidence failed both the reliability and assistance to the trier of fact prongs was not an abuse of discretion.[15]

SO ORDERED.

---

[14]   The district court also properly rejected, on the basis of <u>Daubert</u>, Eduardo's third rationale for admitting the expert witness testimony about his mental state – to show that he was easily influenced by his employees – because of the experts' inability to testify with any medical certainty about his mental state during the relevant time period.

[15]   In light of our decision that the district court did not abuse its discretion in excluding the testimony of the two doctors on the basis of the IDRA and Rule 702, we need not address the district court's alternative ground, Fed. R. Evid. 403.